**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 NOV -4 PM 4: 09

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST BY CINCINNATI

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO.** 1:20CR 136 |
| **Plaintiff,** | : | |
| | : | **JUDGE** J. McFARLAND |
| **v.** | : | |
| | : | **I N D I C T M E N T** |
| **JEFFREY PASTOR and** | : | |
| **TYRAN MARSHALL,** | : | **18 U.S.C. § 2** |
| | : | **18 U.S.C. § 666(a)(1)(B)** |
| **Defendants.** | : | **18 U.S.C. § 1343** |
| | : | **18 U.S.C. § 1346** |
| | : | **18 U.S.C. § 1349** |
| | : | **18 U.S.C. § 1951(a), (b)(2)** |
| | : | **18 U.S.C. § 1956(a)(1)(B)** |
| | : | |
| | : | **FORFEITURE ALLEGATIONS** |

**THE GRAND JURY CHARGES**:

At times relevant to this Indictment:

1.     The City of Cincinnati was a municipal corporation and political subdivision of the

State of Ohio located in the Southern District of Ohio.  The City of Cincinnati received federal

benefits in excess of $10,000 during both the twelve-month calendar year of 2018 and the twelve-

month calendar year of 2019.

**The Defendants and Related Entities**

2.     The defendant, **JEFFREY PASTOR**, was an agent of the City of Cincinnati, that

is, he was employed as an elected member of the City of Cincinnati City Council.  In his role as

an elected member of Cincinnati City Council, **PASTOR** was a "public official," who owed a duty

to provide honest services to the citizens of the City of Cincinnati and to the Cincinnati City

Council.  Because of his role as an elected member of Cincinnati City Council, the Citizens of

Cincinnati and the Cincinnati City Council had an intangible right to the honest services of **PASTOR**.

3.     The defendant, **TYRAN MARSHALL**, was a business partner of **PASTOR**. **MARSHALL** served as a "middleman" for purposes of receiving bribe payments for **PASTOR**.

4.     "Ummah" was the name of various entities connected to **PASTOR** and **MARSHALL**, which were incorporated or registered during a short period of time in late 2018. For example, "Ummah Strength, LLC" was incorporated as a non-profit limited liability corporation with the Ohio Secretary of State by **MARSHALL** on or about September 11, 2018, and filed its certificate of dissolution with the Ohio Secretary of State on or about October 26, 2018. "Ummah Development Group, LLC" was incorporated as a for-profit limited liability company with the Ohio Secretary of State by **MARSHALL** on or about October 24, 2018 – two days before Ummah Strength, LLC dissolved. "Ummah Strength" was registered as a non-profit corporation with the Ohio Secretary of State on or about November 29, 2018, listing **MARSHALL** as its statutory agent.

### Other Individuals

5.     Cooperating Witness 1 was a developer pursuing a real estate development project ("Project 1") in Cincinnati. Project 1 required City of Cincinnati official action prior to development by Cooperating Witness 1. Cooperating Witness 1 was cooperating with and operating at the instruction of law enforcement with respect to Project 1.

6.     Cooperating Witness 2 was a developer pursuing a real estate development project ("Project 2") in Cincinnati. Project 2 required City of Cincinnati official action prior to development by Cooperating Witness 2. Cooperating Witness 2 was cooperating with and operating at the instruction of law enforcement with respect to Project 2.

7.      UCE-1 was an undercover law enforcement agent who posed as a business partner and financial supporter of Cooperating Witness 1 on Project 1 and who posed as a business partner and financial supporter of Cooperating Witness 2 on Project 2.

## The Extortion and Bribery Scheme Related to Projects 1 and 2

8.      Between September 2018 and November 2018, during recorded interactions, **PASTOR** solicited and received $35,000 (in three separate payments), aided by **MARSHALL**, in exchange for promised official action related to projects before the City of Cincinnati.

9.      In September 2018, **PASTOR** and **MARSHALL** travelled via private airplane to Miami, Florida intending to meet with investors related to Cooperating Witness 1's business before the City of Cincinnati.  The trip lasted approximately two days.  **PASTOR** never paid for the trip nor disclosed the trip.

10.     During the trip, on or about September 26, 2018, **PASTOR** explained to UCE-1 and others that **PASTOR** would ensure favorable official action in the City of Cincinnati for Project 1.  **PASTOR** also explained during the meeting that he could receive money through **MARSHALL's** non-profit entity.

11.     On or about September 27, 2018, while in Miami, **PASTOR** met with UCE-1 to "talk about compensation."  During the meeting, **PASTOR** agreed to accept $15,000 and other future benefits in return for providing favorable official action relating to Project 1 and Project 2. **PASTOR** later stated that the purpose of **MARSHALL's** non-profit entity was to "*sanitize*" the money.

12.     On September 27, 2018, after flying back to Cincinnati from Miami that day, **PASTOR** called UCE-1 to "*negotiate a monthly retainer*."  They agreed again that $15,000 would be paid to **PASTOR** for Projects 1 and 2, projects before the City of Cincinnati.

13.     Approximately a week later, on or about October 4, 2018, **PASTOR** accepted $15,000 in cash from UCE-1. That same day, during a call with Cooperating Witness 1 to discuss Project 1, **PASTOR** told Cooperating Witness 1 to coordinate further discussions about the project through **MARSHALL**. As instructed by **PASTOR**, Cooperating Witness 1 then spoke by telephone with **MARSHALL**, and **MARSHALL** set up a time the next day to meet with Cooperating Witness 1 to discuss Project 1.

14.     Despite the $15,000 from UCE-1 for helping pass Projects 1 and 2 through the City, shortly after receiving the payment, **PASTOR** and **MARSHALL** began reaching out directly to Cooperating Witness 1 and Cooperating Witness 2 to solicit additional payments in exchange for **PASTOR** supporting the Projects.

15.     On or about October 5, 2018, **MARSHALL** met with Cooperating Witness 1. During the meeting, **MARSHALL** told Cooperating Witness 1 that **PASTOR** was confident about getting votes for Project 1. **MARSHALL** also stated that **PASTOR** was going to want to discuss compensation. Following the meeting, on or about October 5, 2018, **MARSHALL** sent a text message to Cooperating Witness 1 that stated, in part, "*20k for the latter part of our discussion (10 a piece).*" Approximately five days later, on or about October 10, 2018, **MARSHALL** told Cooperating Witness 1 during a telephone call, "*Most definitely twenty. You know, take care, take care of what we need to take care of.*" **MARSHALL** then stated, "*A lot of what you all doing is going through council and that is where Jeff [**PASTOR**] comes in, and Jeff, Jeff, definitely gonna hold you down.*"

16.     On or about October 9, 2018, **PASTOR** and **MARSHALL** met with Cooperating Witness 2 about helping to get Project 2 favorable official action from the City of Cincinnati.

17.     **MARSHALL** called Cooperating Witness 2 a few days later (on or about October 15, 2018) to discuss the non-profit, Ummah Strength.  During the call, **MARSHALL** stated that **PASTOR** wanted to see Cooperating Witness 2's real estate project succeed.  **MARSHALL** also asked for a $22,500 donation to fund the non-profit ($2250 to file the 501(c)(3) paperwork and $20,000 to "*spearhead the non-profit*").  **MARSHALL** had previously incorporated Ummah Strength LLC as a limited liability company in September 2018, approximately two weeks before **PASTOR's** and **MARSHALL's** trip to Miami.

18.     On or about October 16, 2018, **PASTOR** had a telephone call with UCE-1.  During the call, UCE-1 confronted **PASTOR** about the demand for money from Cooperating Witness 2 for Project 2.  **PASTOR** acknowledged that **MARSHALL** called Cooperating Witness 2 and asked for payment for Project 2.  **PASTOR** agreed that he would be paid by UCE-1 $10,000 now and another $10,000 later for Project 2.  **PASTOR** explained that payment should go straight to **MARSHALL**.  In a follow-up call later that day, **PASTOR** called UCE-1 and asked, "*why do they keep putting this all on you*?"—in reference to UCE-1 being the one paying **PASTOR** to support Project 1 and Project 2.  **PASTOR** explained, "*in my opinion and in Tyran's opinion, I thought it was incredibly unfair. . . . [Y]ou know, they live here in the City of Cincinnati and you're outside the City of Cincinnati.*"

19.     Following the October 16, 2018 call, **PASTOR** and **MARSHALL** met with UCE-1 approximately a week later (on or about October 24, 2018), during which **MARSHALL** received $10,000 in cash from UCE-1.  During the meeting, **PASTOR** discussed his benefit to UCE-1 as a "*swing vote*" on City Council.  That same day, **MARSHALL** incorporated Ummah Development Group, LLC in Ohio.

20.    On or about October 31, 2018, a few days after the $10,000 cash payment, **PASTOR** called Cooperating Witness 2 and stated, with regards to Project 2, "*you will come to the City, the City will sell it to you and it will pass unanimously. That is my prophecy, my brother. You will come to the City, it will pass unanimously.*"

21.    On or about November 15, 2018, **PASTOR** and **MARSHALL** met with UCE-1, to receive the second installment of the $20,000. During the meeting, **MARSHALL** received a $10,000 cashier's check for Ummah Strength, LLC from UCE-1. Later that same day, the $10,000 cashier's check was deposited into a Chase Bank account for Ummah Strength, LLC. The check was signed by **MARSHALL** upon deposit. On or about November 27, 2018, less than two weeks later, **MARSHALL** withdrew $6,000 from the account.

22.    On or about January 6, 2019, **MARSHALL** sent a series of text messages to UCE-1 that read:

> *Peace and happy new year [UCE-1], hope you and the family had an enjoyable and safe holiday! When you get a moment we need to converse with you about our pay. We need to share our thoughts on what we are looking for, which is a base salary, and to hear your thoughts on it. Thanks, T.*

23.    On or about January 11, 2019, UCE-1 sent to **PASTOR** a text message that read:

> *Hey buddy I tried to call you. Don't worry about calling me back I know you're busy. Just letting you know the development deal for [Project 1] is going through today. I got some good confirmation that nothing should be holding it up.Shovel [sic] hits the ground everybody's going to get paid including you guys thanks for all your work hope it's all good talk to you soon*

24.    That same day, **PASTOR** "Liked" the messages. **PASTOR** then responded,

> *Congrats my man! No need for me to get paid. Will help you with my colleagues. Let me know what you need.*

25.    On or about January 12, 2019, **MARSHALL** sent to UCE-1 a series of text messages that read:

> *Peace and good afternoon [UCE-1]. Congratulations on the [Project 1]! Knew it was going to happen. I'm looking forward to the seed money for Ummah Development when you break ground. I want to get as much experience on this project as possible. I also still want to converse about us becoming an employee and receiving base salary as a sales rep on development in and out the city. Have any questions call me.*

26.     Later that same day, **MARSHALL** called UCE-1 and referenced "*base salaries*" for **PASTOR** and **MARSHALL**, despite **PASTOR's** January 11, 2019 text message. **MARSHALL** stated, "*everything is through me, Ummah Development, . . . Jeff can't be caught up in nothing like that*." **MARSHALL** explained that they did not want to raise any "*red flags*." **MARSHALL** further stated that he is looking forward to "*seed money*" for Ummah Development once Project 1 breaks ground.

27.     **PASTOR** and **MARSHALL** met with Cooperating Witness 2 three days later, on or about January 15, 2019.  During the meeting, **PASTOR** stated that he wanted Cooperating Witness 2 to pay him $115,000 per year and to pay **MARSHALL** $85,000 per year, and he also wanted "*points on the deal*."  **PASTOR** stated there is "*a lot of money to be made on*" Project 2. **PASTOR** further stated he "*thanks god for the little twenty,*" but the $200,000 is "*the median income to do the things he's doing*."

28.     On or about January 21, 2019, **MARSHALL** called Cooperating Witness 2 to set up a time to discuss the $200,000 payment.

29.     On or about January 25, 2019, **PASTOR** had a call with Cooperating Witness 2 during which **PASTOR** stated that he "*strongly suggested*" to City officials to sell land to Cooperating Witness 2 to further Project 2.  **PASTOR** also stated that UCE-1 had indicated that he would rather work with **PASTOR** only rather than through **MARSHALL**, and **PASTOR** asked

if Cooperating Witness 2 felt the same way. **PASTOR** then explained that he previously thought that, "*you guys could be FBI plants*."

30.    On or about January 30, 2019, **PASTOR** met with UCE-1. **PASTOR** stated he wanted a salary of $115,000 so they could "*get the best*" out of him, and **PASTOR** mentioned all the work **PASTOR** was doing for them in the City. **PASTOR** explained that he was getting paid "*pennies on the dollar*" for the work he was doing for them. **PASTOR's** solicitation for a salary to help on City projects was rejected.

## PASTOR's Continued Bribery of Cooperating Witness 2 in 2019

31.    Following the January 30, 2019 meeting, **PASTOR** began reaching out to Cooperating Witness 2 directly for payment relating to Project 2.

32.    On February 6, 2019, **PASTOR** met with Cooperating Witness 2. **PASTOR** explained the steps he was taking to help with Project 2—to include pressuring City officials to support the project—and then stated, "*I would like to be compensated for my time*." During the meeting, **PASTOR** demanded an additional $25,000 from Cooperating Witness 2 to "*keep him engaged*." **PASTOR** explained that the money he received previously from the UCE-1 "*doesn't dignify the work that I am doing*." **PASTOR** then stated he wanted to be compensated for what he had already done for Project 2, and compensated on the "*back end*." **PASTOR** indicated he would accept $10,000 cash now and the remaining $15,000 later. **PASTOR** also suggested he would like a small percentage on the deal after favorable official action from the City relating to Project 2.

33.    On February 13, 2019, **PASTOR** met with Cooperating Witness 2, during which **PASTOR** received $10,000 in cash from Cooperating Witness 2 in return for help with Project 2, consistent with the agreement from the February 6, 2019 meeting.

34.     Following a meeting with City officials, **PASTOR** and Cooperating Witness 2 had a series of meetings and telephone calls to discuss **PASTOR's** progress getting Project 2 passed through the City in Cooperating Witness 2's favor, along with additional requests for compensation to **PASTOR** in exchange for his help getting a deal for the project through the City. Specifically, in follow-up conversations with Cooperating Witness 2, **PASTOR** discussed receiving the following amounts:

- on February 25, 2019, **PASTOR** solicited $15,000, through two payments of $7,500 each;

- on February 27, 2019, Cooperating Witness 2 agreed to pay **PASTOR** $30,000 at the end of the deal;

- on a March 4, 2019 call, **PASTOR** again wanted $7,500 now and $7,500 later (in **PASTOR's** words, the "regular" deal); and

- on a March 4, 2019 meeting following the call, **PASTOR** wanted $7,500 now and $7,500 later, plus a percentage of the overall deal.

### COUNT 1
### (Conspiracy to Commit Honest Services Wire Fraud)

### The Conspiracy

35.     The allegations contained in paragraphs 2 through 30 of the Indictment are incorporated here.

36.     From on or about September 4, 2018 to on or about January 25, 2019, in the Southern District of Ohio and elsewhere, the defendants, **JEFFREY PASTOR** and **TYRAN MARSHALL**, and others known and unknown to the grand jury, did knowingly conspire and agree with each other and others known and unknown to the grand jury to execute and attempt to execute a scheme and artifice to defraud and deprive the citizens of the City of Cincinnati and the Cincinnati City Council of the honest services of **PASTOR**, an elected member of Cincinnati City

Council, through bribery and the concealment of material information, in violation of 18 U.S.C. §§ 1343, 1346, and 2.

### The Purpose and Object of the Conspiracy

37.     The purpose and object of the conspiracy was for the defendants, **JEFFREY PASTOR** and **TYRAN MARSHALL**, to use **PASTOR's** official position with Cincinnati City Council to enrich **PASTOR** and **MARSHALL** and others through corruption by soliciting, seeking, receiving, accepting, and agreeing to receive and accept things of value from individuals with business before the City of Cincinnati in exchange for favorable official action by **PASTOR** for those individuals.

### The Manner and Means of the Conspiracy

38.     The manner and means by which the defendants, **JEFFREY PASTOR** and **TYRAN MARSHALL**, sought to accomplish the objectives of the conspiracy included the following:

a.      It was part of the conspiracy that **PASTOR** and **MARSHALL** solicited, sought, received, accepted, and agreed to receive and accept payment of money and other things of value from Cooperating Witness 1 and from UCE-1, knowing that Cooperating Witness 1 had business before the City of Cincinnati and believing that UCE-1 was a business partner of Cooperating Witness 1 with regards to Project 1.

b.      It was further part of the conspiracy that, in exchange for and because of the payment of money and other things of value, **PASTOR** and **MARSHALL** promised favorable official action by **PASTOR**, and **PASTOR** provided favorable official action, for the benefit of UCE-1, Cooperating Witness 1, and Project 1, as requested and as opportunities arose.

c.     It was further part of the conspiracy that **PASTOR** and **MARSHALL** solicited, sought, received, accepted, and agreed to receive and accept payment of money and other things of value from Cooperating Witness 2 and from UCE-1, knowing that Cooperating Witness 2 had business before the City of Cincinnati and believing that UCE-1 was a business partner of Cooperating Witness 2 with regards to Project 2.

d.     It was further part of the conspiracy that, in exchange for and because of the payment of money and other things of value, **PASTOR** and **MARSHALL** promised favorable official action by **PASTOR**, and **PASTOR** provided favorable official action, for the benefit of UCE-1, Cooperating Witness 2, and Project 2, as requested and as opportunities arose.

e.     It was further part of the conspiracy that **PASTOR** and **MARSHALL** took steps to hide, conceal, and cover up their activity through the use of a corporate entity to hide and conceal payment provided in exchange for official action.

f.     It was further part of the conspiracy that **PASTOR** and **MARSHALL** used interstate wire communications to further the corrupt scheme.

**In violation of Title 18, United States Code, Section 1349.**

## COUNT 2
### (Honest Services Wire Fraud)

39.     Paragraphs 2 through 30 of the Indictment are incorporated here.

40.     Beginning on or about June 11, 2018 to on or about January 30, 2019, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, knowingly devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the City of Cincinnati and the Cincinnati City Council of the honest services of **PASTOR**, an elected member of Cincinnati City Council, through bribery and the concealment of material information.

## PURPOSE OF SCHEME

41.     The purpose of the scheme and artifice was for **PASTOR** to use his official position with Cincinnati City Council to enrich himself and others through corruption by soliciting, seeking, receiving, accepting, and agreeing to receive and accept things of value from individuals with business before the City of Cincinnati in exchange for favorable official action for those individuals.

## MANNER AND MEANS

42.     The scheme and artifice was carried out in the following manner and means, among others:

a.     **PASTOR** solicited, sought, received, accepted, and agreed to receive and accept payment and things of value from Cooperating Witness 1, from Cooperating Witness 2, and from UCE-1, knowing that Cooperating Witness 1 and Cooperating Witness 2 had business before the City of Cincinnati, and believing that UCE-1 was a business partner of both Cooperating Witness 1 and Cooperating Witness 2.  The things of value received and accepted included **PASTOR's** acceptance from UCE-1 of $10,000 cash on or about August 2, 2018; **PASTOR's** acceptance from UCE-1 of $15,000 cash on or about October 4, 2018; **PASTOR's** accpetance from UCE-1 through a middleman of $10,000 cash on or about October 24, 2018; and **PASTOR's** acceptance from UCE-1 through a middleman of a $10,000 check written to Ummah Strength LLC on or about November 15, 2018.

b.     In exchange for and because of things of value, **PASTOR** provided favorable official action and promised to provide favorable official action for the benefit of UCE-1, Cooperating Witness 1, and Cooperating Witness 2, as requested and as opportunites arose, including official action by and through Cincinnati City Council relating to votes and official action for the benefit of UCE-1, Cooperating Witness 1, and Cooperating Witness 2.

c. **PASTOR** took steps to hide, conceal, and cover up his activity through the use of a middleman and the use of a corporate entity to hide payments provided in exchange for official action.

## USE OF INTERSTATE WIRES

43. On or about September 27, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce a telephone call from **PASTOR** to UCE-1 during which **PASTOR** stated he wanted to "negotiate the monthly retainer" with UCE-1.

**In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.**

## COUNT 3
**(Bribery Concerning Programs Receiving Federal Funds)**

44. Paragraphs 1 through 13 of the Indictment are incorporated here.

45. From on or about September 25, 2018 to on or about October 4, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, being an agent of a local government that received federal benefits in excess of $10,000 in the twelve-month period from January 2018 to December 2018, corruptly solicited and demanded for his own benefit, and accepted and agreed to accept a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and series of transactions of such local government involving a thing of value of $5,000 and more, to wit, the defendant, **JEFFREY PASTOR**, while a member of Cincinnati City Council, corruptly solicited, demanded, accepted, and agreed to accept $15,000 in cash from UCE-1, an individual who **PASTOR** believed was working for the benefit of Cooperating Witness 1 and Cooperating Witness 2, while intending to

be influenced and rewarded in connection with business, a transaction, and series of transactions involving the City of Cincinnati.

**In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2**.

## COUNT 4
### (Attempted Extortion under Color of Official Right)

46.     Paragraphs 2 through 13 of the Indictment are incorporated here.

47.     From on or about September 25, 2018 to on or about October 4, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, a member of the Cincinnati City Council, knowingly attempted to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18 United States Code 1951, to wit, the defendant, **JEFFREY PASTOR**, solicited, obtained, agreed to accept, accepted, and received $15,000 in cash from UCE-1, with UCE-1's consent, knowing the payment was made in exchange for the defendant's official action in his role as a member of the Cincinnati City Council, under color of official right.

**In violation of Title 18, United States Code, Sections 1951(a), (b)(2) and 2**.

## COUNT 5
### (Bribery Concerning Programs Receiving Federal Funds)

48.     Paragraphs 1 through 21 of the Indictment are incorporated here.

49.     From on or about October 4, 2018 to on or about November 15, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, being an agent of a local government that received federal benefits in excess of $10,000 in the twelve-month period from January 2018 to December 2018, aided and abetted by the defendant, **TYRAN MARSHALL**, corruptly solicited and demanded for their own benefit, and accepted and agreed to accept a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and series of transactions of such local government involving a thing

of value of $5,000 and more, to wit, the defendant, **JEFFREY PASTOR**, while a member of Cincinnati City Council, through his "middleman" **TYRAN MARSHALL**, corruptly solicited, demanded, accepted, and agreed to accept two payments totaling $20,000 and more from UCE-1, an individual **PASTOR** and **MARSHALL** believed was working for the benefit of Cooperating Witness 1 and Cooperating Witness 2, while intending **PASTOR** to be influenced and rewarded in connection with business, a transaction, and series of transactions involving the City of Cincinnati.

**In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.**

<u>**COUNT 6**</u>
**(Attempted Extortion under Color of Official Right)**

50.     Paragraphs 2 through 21 of the Indictment are incorporated here.

51.     From on or about October 4, 2018 to on or about November 15, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, a member of the Cincinnati City Council, aided and abetted by the defendant, **TYRAN MARSHALL**, knowingly attempted to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18 United States Code 1951, to wit, the defendant, **JEFFREY PASTOR,** through the use of his "middleman" **TYRAN MARSHALL,** solicited, obtained, agreed to accept, accepted, and received two payments totaling $20,000 from UCE-1, with UCE-1's consent, knowing the payments were made in exchange for **PASTOR's** official action in his role as a member of the Cincinnati City Council, under color of official right.

**In violation of Title 18, United States Code, Sections 1951(a), (b)(2) and 2.**

<u>**COUNT 7**</u>
**(Money Laundering)**

52.     Paragraphs 2 through 21 of the Indictment are incorporated here.

53.     From on or about September 25, 2018 to on or about November 29, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, a member of the Cincinnati City Council, aided and abetted by the defendant, **TYRAN MARSHALL**, knowingly did conduct and attempt to conduct a financial transaction affecting interstate commerce, to wit: deposited into a Chase Bank account titled, Ummah Strength, LLC, on or about November 15, 2018, a cashier's check in the amount of $10,000, which constituted proceeds of specified unlawful activity, namely: 18 U.S.C. § 666(a)(1)(B) (bribery concerning programs receiving federal funds); 18 U.S.C. §§ 1343, 1346 (honest services wire fraud); 18 U.S.C. § 1951 (extortion under color of official right), knowing that the transaction was designed in whole or in part to conceal and disguise the nature, source, ownership and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is, the cashier's check in the amount of $10,000, represented the proceeds of some form of unlawful activity.

**In violation of Title 18, United States Code, Sections 1956(a)(1)(B) and 2.**

## COUNT 8
### (Honest Services Wire Fraud)

54.     Paragraphs 2 through 7 and 31 through 34 of the Indictment are incorporated here.

55.     Beginning on or about February 4, 2019 to on or about April 11, 2019, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, knowingly devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the City of Cincinnati and the Cincinnati City Council of the honest services of **PASTOR**, an elected member of Cincinnati City Council, through bribery and the concealment of material information.

## PURPOSE OF SCHEME

56.     The purpose of the scheme and artifice was for **PASTOR** to use his official position with Cincinnati City Council to enrich himself and others through corruption by soliciting, seeking, receiving, accepting, and agreeing to receive and accept things of value from Cooperating Witness 2, an individual with business before the City of Cincinnati, in exchange for favorable official action for Cooperating Witness 2.

## MANNER AND MEANS

57.     The scheme and artifice was carried out in the following manner and means, among others:

a.     **PASTOR** solicited, sought, received, accepted, and agreed to receive and accept things of value from Cooperating Witness 2 knowing that Cooperating Witness 2 had business before the City of Cincinnati and Cincinnati City Council. The things of value received and accepted included **PASTOR's** acceptance of $10,000 cash from Cooperating Witness 2 on or about February 13, 2019.

b.     In exchange for and because of things of value, **PASTOR** provided favorable official action and promised to provide favorable official action for the benefit of Cooperating Witness 2 and Project 2 as requested and as opportunites arose, including official action by and through Cincinnati City Council relating to votes and official action for the benefit of Cooperating Witness 2.

c.     **PASTOR** took steps to hide, conceal, and cover up his activity and the nature and scope of his dealings with Cooperating Witness 2.

## USE OF INTERSTATE WIRES

58.     On or about March 4, 2019, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, for the purpose of executing the above-described scheme and

artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, a telephone call in which **PASTOR** told Cooperating Witness 2:

> I want to make sure that just as you're hedging your risk, then I want to be able to hedge our risk. If, if, if I thought, what was extremely reasonable was like okay, what I thought I heard you say, 'hey, here's $7,500 you get this done, boom and then at the end we'll give you another $7,500'; like, I like shit like that.

**In violation of Title 18, United States Code, Sections 1343 and 1346.**

## COUNT 9
### (Bribery Concerning Programs Receiving Federal Funds)

59.     Paragraphs 1 through 7 and 31 through 34 of the Indictment are incorporated here.

60.     From on or about February 4, 2018 to on or April 11, 2018, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, being an agent of a local government that received federal benefits in excess of $10,000 in the twelve-month period from January 2019 to December 2019, corruptly solicited and demanded for his own benefit, and accepted and agreed to accept a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and series of transactions of such local government involving a thing of value of $5,000 and more, to wit, the defendant, **JEFFREY PASTOR**, while a member of Cincinnati City Council, corruptly solicited, demanded, accepted, and agreed to accept payment from Cooperating Witness 2, including $10,000 in cash on February 13, 2019, while intending to be influenced and rewarded in connection with business, a transaction, and series of transactions involving the City of Cincinnati.

**In violation of Title 18, United States Code, Section 666(a)(1)(B).**

## COUNT 10
### (Attempted Extortion under Color of Official Right)

61.     Paragraphs 2 through 7 and 31 through 34 of the Indictment are incorporated here.

62.    From on or about February 4, 2019 to on or about April 11, 2019, in the Southern District of Ohio and elsewhere, the defendant, **JEFFREY PASTOR**, a member of the Cincinnati City Council, knowingly attempted to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18 United States Code 1951, to wit, the defendant, **JEFFREY PASTOR**, solicited, obtained, agreed to accept, accepted, and received things of value from Cooperating Witness 2, including $10,000 in cash on February 13, 2019, with Cooperating Witness 2's consent, knowing the payments were made in exchange for the defendant's official action in his role as a member of the Cincinnati City Council, under color of official right.

**In violation of Title 18, United States Code, Section 1951(a), (b)(2).**

## FORFEITURE ALLEGATION 1

Upon conviction of one or more of the offenses set forth in Counts 1 through 6 and 8 through 10 of this Indictment, the defendants, **JEFFREY PASTOR** and **TYRAN MARSHALL**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s), including but not limited to a sum of money equal to at least $55,000, which represents the amount of proceeds the defendant(s) obtained as a result of the offense(s).

## FORFEITURE ALLEGATION 2

Upon conviction of the offense set forth in Count 7 of this Indictment, the defendants, **JEFFREY PASTOR** and **TYRAN MARSHALL**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property, including but not limited to a sum of money equal to at least $10,000, which represents the amount of money involved in the offense.

**SUBSTITUTE ASSETS**

If any of the property described above, as a result of any act or omission of the defendants:

a.       cannot be located upon the exercise of due diligence;

b.       has been transferred or sold to, or deposited with, a third party;

c.       has been placed beyond the jurisdiction of the court;

d.       has been substantially diminished in value; or

e.       has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) or 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of the defendants, up to the value of the property described above.

**A TRUE BILL**

l s/
_____
**GRAND JURY FOREPERSON**

**DAVID M. DEVILLERS**
**UNITED STATES ATTORNEY**

_____
**MATTHEW C. SINGER/EMILY N. GLATFELTER**
**ASSISTANT UNITED STATES ATTORNEYS**

Page **20** of **20**