**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 1:20CR136 |
| JEFFERY PASTOR, | : | Judge McFarland |
| Defendant. | | |

**SENTENCING MEMORANDUM**

On December 21, 2023, Jeffery Pastor will be sentenced by this Court for his conviction of Honest Services Wire Fraud in violation of 18 U.S.C. § 1343, 1346. For reasons set forth in this memorandum and further expounded upon at the upcoming sentencing hearing, Mr. Pastor respectfully requests that the Court sentence him to a term of 12 months and 1 day of imprisonment. Such a sentence is not only just and reasonable, it is "sufficient, but not greater than necessary" to effectuate Congress's sentencing purposes set forth in 18 U.S.C. § 3553(a).

I.   **INTRODUCTION**

In November of 2017, Jeffery Pastor was elected to the Cincinnati City Council after running on a platform aimed at improving the lives of the working-class and the poor. Growing up in a home with an abusive, crack-addicted stepfather, in a neighborhood that he refers to as "the projects," Mr. Pastor viscerally understands and empathizes with those living on the fringes of society. Having always been a helper, with a kind, listening ear, ready to lay his life down in service to this country if asked, Mr. Pastor saw City Council as an opportunity for him to give voice to the powerless and to effect change on systemic levels, not only in individual lives. Based on his own life experiences, he wanted to help those who could not afford safe housing, to ensure

that safety nets could catch those who had no family to help them, to arm women with the tools to protect themselves, to build bridges with law enforcement to make Cincinnati a safer and more just place to live for all, including people of color. And for a period of time he did what he set out to do. In his role as a Council member and beyond, Jeffery helped to secure resources for mental health support in heavily impoverished areas of Cincinnati. He supported criminal expungement clinics for qualified individuals. He led the charge in organizing the largest concealed-carry firearm course in a church in Roselawn, free of charge, which drew approximately 180 women. And after the murder of George Floyd, Jeffery was the only Council member in the streets supporting both the aggrieved citizens and police officers. But because Mr. Pastor came to his job as a Council member with unprocessed trauma from his formative years and because he was suffering significant financial distress at the time—compounded by his childhood experiences of living in poverty—he was vulnerable to the culture of public corruption that we now know existed in certain political spheres in Ohio.

Beginning around June 11, 2018, and continuing through January 30, 2019, Mr. Pastor made a series of much-regretted choices that compromised his integrity and deprived the citizens of Cincinnati of his honest services as their elected official. Mr. Pastor is truly remorseful for his crime and has taken full responsibility for his wrongdoing, both publicly and privately, and he has spent the years since his arrest addressing the underlying issues that have plagued him since childhood to ensure he will never be that vulnerable, that tempted to make choices antithetical to his core values ever again.

Understanding the significance of his crime, Mr. Pastor has elected to not ask the Court to spare him from prison, although that option is explicitly carved out for him in his plea agreement. Unlike former Council members Tamaya Dennard and P.G. Sittenfeld, who committed the same

crime but aggressively argued that a sentence of probation was sufficient to effectuate the goals of sentencing enumerated in 18 U.S.C. 3553(a), Mr. Pastor acknowledges that his conduct warrants a term of imprisonment. Notwithstanding what for him is the unimaginable anguish of being taken from his young children and his loved ones, imprisonment would, *inter alia*, serve as a deterrent to any public official contemplating the commission of the same crime. The question for the Court at the sentencing hearing on December 21, 2023, then, is not whether to imprison Mr. Pastor, but for how long. In order for this Court to arrive at a just and fair determination regarding the length of imprisonment, the Court must, among other things, acknowledge issues of race and class affecting the American criminal justice system because the Court's sentence must not reinforce a criminal justice system that favors the affluent white defendant.

For the reasons below, 12 months and 1 day of imprisonment is sufficient punishment for Mr. Pastor's crime.

## II. **LEGAL STANDARD**

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." United States v. Demma, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552 U.S. 38, 49 (2007). However, the range is merely one factor to consider when imposing a sentence. *Id*. at 59 ("[T]he Guidelines are only one of the factors to consider when imposing a sentence, and 3553(a)(3) directs the judge to consider sentences other than" lengthy imprisonment). And the guideline range should not be construed as a presumptively reasonable sentence. Nelson v. United States, 555 U.S. 350 (2009) (district courts may not presume that a sentence imposed within a correctly calculated guideline range is "reasonable").

Instead, to arrive at a just and reasonable sentence, the Court must look at the totality of the circumstances before it and engage with the sentencing factors outlined in 18 U.S.C. 3553(a). In practical terms, this requires the Court to wrestle with questions specific to this case and this defendant, including considering Mr. Pastor's history and characteristics, the nature and circumstances of the offense, and the need to avoid unwarranted sentencing disparity among similarly situated defendants. In addition, the Court must consider the need for deterrence—both specific and general—and retribution. See 18 U.S.C. 3553(a). Of course, the Court does not engage with these factors in a vacuum, notwithstanding the requirement that the sentence be tailored to the individual. Instead, societal issues such as race and class inequities that affect individuals differently must also be considered.

No single factor trumps any or all others. Rather, the Court looks at the totality of the statutory factors to determine a just and reasonable sentence, one that is "sufficient, but not greater than necessary."

### III. THE ADVISORY GUIDELINE RANGE CALLED FOR BY THE BINDING PLEA AGREEMENT

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree that the operative Guideline range (i.e., the starting point in the Court's analysis of the 3553(a) factors) is 18-24 months.

The range of 18-24 months is based on the following binding Guideline stipulations contained in the plea agreement:

- 2C1.1(a)(1): base offense level 14
- 2C1.1(b)(2): 2 levels are added because the stipulated bribery amount is 15,000 dollars.
- 2C1.1(b)(3): 4 levels are added because Mr. Pastor was an elected public official.
- 3E1.1(a)&(b): 3 levels are deducted because Mr. Pastor accepted responsibility for his offense in a timely fashion.

This calculation results in a final offense level of 17. An offense level of 17 combined with a criminal history category of I results in a range of 24-30 months. At the time of the negotiated plea agreement, the parties agreed that the sentence imposed would not exceed 24 months, which was the bottom end of the 24-30-month range. However, on November 1, 2023, the recently promulgated Guideline amendments went into effect, one of which has bearing on Mr. Pastor's guideline computation. Specifically, as of November 1, 2023, the now-amended guideline §4C1.1 provides for a 2-level reduction in the offense level for certain "zero-point" offenders. The parties agree that this guideline provision applies to Mr. Pastor because he has no prior criminal history. The application of the amended 4C1.1 to Mr. Pastor's guideline computation serves to reduce his offense level from a 17 to a level 15, resulting in a range of 18-24 months.

If the Court accepts the plea agreement, the Court is bound to begin its analysis of the 3553(a) sentencing factors with a starting-point guideline range of 18-24 months. Further, the plea agreement, if accepted, permits the Court to select a sentence as low as probation but prohibits a sentence greater than 24 months.

As discussed below, Mr. Pastor's history and characteristics, his pleading guilty and taking responsibility for his actions, the nature and seriousness of the offense and the need to promote respect for the law, his post-offense recalibration of his life, and the sentences given to similar defendants who have committed the same crime nationally and in the Southern District of Ohio, support Mr. Pastor's request for a downward variance from the range of 18-24 months to a sentence of 12 months and 1 day.

**IV.    JEFFERY PASTOR'S HISTORY AND CHARACTERISTICS**

To understand just how improbable it was that Jeffery Pastor—a then-36-year-old Black Republican who grew up in the projects and had never run for office—was elected to Cincinnati

City Council at all, let alone on his first attempt, one has to delve into his history. But to understand *why* he was elected to Cincinnati City Council on his first attempt, one need spend only ten minutes talking with him: His courage, creativity, commitment to making this world—and Cincinnati in particular—a better place, his unshakable love for children, his resilience and fortitude, his deep kindness, his curiosity about others, and his overwhelming need to help all answer that question of why Cincinnati chose a newcomer with no family wealth or political connections to help lead it forward into a stronger, more just, more accessible city.

Jeffery Pastor suffered a deeply traumatic childhood. His mother Ramona Shaw birthed Jeff when she was 17, still a child herself. Her own childhood was riddled with trauma and abuse, as she spent almost a decade in foster care, in homes that were unsafe, with people who hurt her. As trauma does, it informed many of the choices she made in her romantic life and as a parent to Jeff and his three younger siblings. Ms. Shaw was a loving, strict parent who wanted nothing more than to give her children the safety and stability she never had, and she moved mountains and worked tirelessly to that end. She "wanted to be the pillar of influence" in her children's lives, so she moved out of her mother's home into her own apartment when Jeffery was just a baby. As she says, she "always taught Jeffery and his siblings to love and serve God, to do what is right, and to respect others." But the outside world made her dream of creating a stable, safe home next to impossible. Drugs and violence were rampant in the impoverished neighborhood where they lived for those early years, and the family's financial struggles forced her to work multiple jobs to make ends meet. Since Ms. Shaw's workday often had her leaving before 5 a.m., Jeff—the eldest of her four children—was left to care for his younger siblings. From a very early age, he got his siblings out of bed, fed them breakfast when there was food to be had, packed their book bags, and got them all to school.

Ms. Shaw's dedication to her children's safety and to creating a stable home meant she broke the generational cycle of poverty into which she was born and bought a house in Carthage when Jeffery was ten years old. They were the only Black family in that working-class neighborhood, but Jeffery bridged that racial divide early on, by cutting grass, shoveling snow, going to the neighborhood store for elderly neighbors, sitting on their porch, talking, listening to their stories. According to Ms. Shaw, Jeffery had, since the age of five, wanted to be President—in his kid's mind, that was the pinnacle of a position that would allow him to change the world: "He wanted to change things to make them better for people like us," she says, "People who were poor, single parents, the single parent working tirelessly to put them in a better environment so they could thrive to be anything they desired and not what circumstances created." Ms. Shaw notes that it hurt Jeffery to see her work so hard for so long, and he would often promise to make it so she could retire so she could spend the quality time with her children that eluded her because of her work obligations and resulting exhaustion.

Jeff is told that his biological father was around for his first two years of life. He has no independent memories of that time, but he knows that his biological father, like all of the men on that side of his family, had profound addiction issues that affected, among all the other things, his ability to support or be present for Jeffery. When Jeff was two-years-old, a man named Melvin Campbell entered his mother's world and did not leave it until he very nearly destroyed it over the course of almost twenty years. Campbell—the man whom Jeffery was supposed to look up to as his stepfather—was addicted to crack cocaine and was violent and unstable. He felt entitled to beat Ms. Shaw and his kids, and he did so routinely and severely. Campbell stole Jeffery's mother's hard-earned pay checks, broke out their car windows on a whim, and kicked Jeffery's mother and the children out of her house for long stretches of time. Jeff recalls how they would oftentimes go

without electricity or would sleep in a car, their suffering unnoticed by their church community and teachers, with no support network of caring, safe extended family to fall back on, no safety net to catch their fall.

In the midst of this, during Jeffery's middle-and-high-school years, every positive male role model he had died, as did his biological father. As his mother describes, "He lost uncles Mark (well known and respected in Cincinnati) and Sean Pastor to sickness and disease, whom he idolized and regarded as mentors. Darryl Pastor to gun violence. His father was tragically hit while crossing the street in Columbus OH, just before preparing to return home after redefining his life. His grandfather, my father Raymond Kelsey, passed away quickly with cancer and my brother Raymond Pitts was tragically drowned by people whom he regarded as friends in Indiana." So, during critical formative years, Jeffery and his family suffered loss after loss of all positive male role models, but Campbell remained.

As the Christmas season arrives each year, one memory in particular still surfaces for Jeff, having become a permanent scar from the abuse he suffered as a child. On December 25, 1999, Campbell, in a fit of rage, ransacked their Carthage home. In active withdrawal from a crack binge, Campbell got into a heated disagreement with Jeffery's mother, breaking windows and the TV, throwing food and household items all over the house. Eventually, the police were called, and as Campbell got dressed to flee the house before they arrived, he yelled at Jeff's mother and the children, "This is the Christmas y'all asses deserve!" Campbell's behavior that Christmas 24 years ago was memorable only for the addition of the gratuitous Christmas-related invective, not because his behavior that day was aberrant. To the contrary, Campbell and Jeffery's mother did not divorce until after Jeffery left home for college, and Jeffery, his siblings, and his mother lived with Campbell's threats and brutality for nearly twenty years.

To escape Campbell's viciousness, and forge a path out of his dire circumstances, Jeff threw himself into academics. He graduated from Withrow High School a year early, in 2001, to attend college at Central State University in Wilberforce, Ohio. Jeffery thrived there and graduated in 2005 with a Bachelor of Arts. While there, he enrolled in the Reserve Officers' Training Corps for two years. At the time, Jeffery had a plan: He wanted to serve his country like his grandfather, his uncle, his great uncle, and a host of cousins had done before him. As he had already begun his seminary education, Jeffery enlisted as a chaplain assistant in 2007.[1] Although he wanted to serve in Iraq, he was commissioned as a Second Lieutenant in the Ohio Army National Guard, with a goal of going full Army one day. In 2009, Jeffery got an inter-service transfer to the United States Navy as an Ensign (also a Second Lieutenant).

In 2010, Jeffery graduated with a Master of Divinity from Payne Theological. With a mission "to forge leaders for ministry in the African American tradition of liberation, reconciliation, social justice, and the dignity of all humankind," Payne was a place where Jeffery was intellectually and spiritually challenged and supported. And, because he is a thoughtful, contemplative, curious person, he loved it. In 2011, Jeffery reassessed his military goals in part because of shifting funding priorities that negatively affected the chaplaincy and in part because the requirements to become a military chaplain would have meant he'd need years of pastoral experience that he could not afford. So, he was honorably discharged and, resilient and creative as he is, Jeffery knew he could create new paths forward. To that end, he earned a Master's Degree

---

[1] This was also the year his mother was diagnosed with Lupus, and Jeffery went home to care for her, making sure she was fed, errands were done, bills were paid, the house was clean, all while still in graduate school and caring for the two daughters he had with his first wife. Ms. Shaw's illness has been exacerbated by the stress and despair of this prosecution and is now affecting her kidneys. She observes that "As a parent, it crushes my soul to even imagine my child being in this position, especially with all the challenges and successes he has endured and accomplished respectively."

in Business Administration from Wright State University in 2013 and went on to teach and find other outlets for his desire to serve.

In June of 2008, Jeffery met the love of his life Tara Pastor. Jeffery was at seminary while Tara was studying at Central State, just across the street from each other. Jeffery had noticed Tara at a basketball game the year before, and he shared with his best friend that he thought she was stunningly beautiful, but he had no idea who she was and didn't think about approaching her at the game. Fast forward to that summer of 2008, and Jeffery happened to see Tara hanging out with some friends on the campus yard. He was not about to let a second chance pass him by, so he approached her and asked if she would walk and talk with him. They talked all night long. Three months later, Jeffery asked Tara to marry him, and five months after that, on Valentine's Day, February 14, 2009, Tara and Jeffery were married. They are approaching their sixteenth anniversary, and Jeffery says he still wants to talk with her all night long. They are best friends and each other's greatest supporter and advocate. Nothing is more important to Jeffery than the happiness, safety, and love of and for his wife and children.

But Jeff was haunted by the ghosts of his childhood, riddled as it was with fear and anxiety. Fear of physical violence in his home. Fear of gun violence outside his window. Fear of an empty refrigerator. Fear of falling through the escape hatch of drug use like so many others in his view. But neither his many unmet basic needs, the parentification he suffered by stepping up to support his siblings while his mother worked, the continual food and home insecurity, the violence inside and outside the home, nor his helplessness to change any of it, pulled Jeffery under. Unlike many of his peers who succumbed to drug abuse or violence because of their environments, Jeff—unaided by therapists or other support systems—channeled his grief, fear, and anxieties in other ways: His childhood made Jeffery a perfectionist, an overachiever, a people pleaser. If people were

pleased, they were less likely to be violent. If he could go above and beyond, he and his family may not have to go without. He may not have been able to control the crime and drug abuse around him, but he could control his focus on school work, he could never make a mistake, and he could—and did—dedicate himself to beating the odds.

Jeffery was of course always aware of the stereotypes about Black men. But he knew in his bones that he was not a stereotype, that he would not allow himself to be written off as so much of the world wanted to do. He would not only graduate high school early, he would go on to college and then get not one but two Master's degrees. He would serve in not one branch of the Armed Forces, but two. And he would be a present, involved, loving husband and father who would help guide his children through the ups and downs of life. He would be there for dinner and for the ball games, for the hard questions and the moments of delight. And he has been. He and his wife Tara have four children together, he has two with his first wife, and he dreams of having many more. Jeffery has an unlimited well of love and caring for children, whether they are his own, those he had as students during his teaching career, or those in the larger community. Indeed, one of the unexpected positives of this post-indictment time period for Jeffery has been that he has had more time with his children, has been able to be even more available to them. And of course, ranging in age as they do from newborn to 18, their needs are many and varied. But what they all have in common is their love for and need of their father. As his twelve-year-old put it, Jeffery supports his children "through sports school and life" and there "would be a piece of me missing if I didn't have my dad present at home." And even his twelve-year-old understands the breadth of Jeffery's compassion and commitment to others, noting that he "hear[s] lot's (sic) of his friends tell me how good of a person he is and how he helped them through school and life just like he did with me."

That this people-pleasing, over-achiever made a terrible choice that will turn him into the very thing he swore he would never become—an absent father—is more crushing to Jeffery than any words could convey. But what Jeffery also recognizes is that his terrible choice to engage in the honest services fraud that landed him here is not all of who he is, and it does not define him. It cannot and does not eclipse all of the good he has done and will not prevent him from doing more good in this world. Jeffery Pastor has defied the odds and challenged the stereotypes all his life, culminating in his improbable election victory. His strength of character and commitment to helping others, to making meaningful, good change in this world, his unyielding dedication to his family and his community, and his relentlessness in pursuit of a safe, stable, loving home for his children are who he is, what define him.

In public corruption cases involving affluent, privileged public officials, defendants argue for and receive downward variances based on their "history and characteristics"—their otherwise law-abiding life, their family history of philanthropy, their academic achievements and charitable works. And courts are right to acknowledge and account for the good in people and their good deeds and to counterbalance them against their crimes. But there is a critical and glaring difference between the public official whose history consists of one advantage after another, whose accomplishments are facilitated by their privilege, and the public official who has—against all odds—risen from adversity and *has also* led an exemplary life full of service and good deeds. Jeffery is the embodiment of that public official. But when fear and insecurity related to housing, food, and safety are so visceral from having been so much a part of the fabric of childhood, when no generations-long safety net exists to help in moments of need, something like losing a job and not knowing how the mortgage will get paid, adversely affects decision-making in terrible and

aberrant ways that, as here, have lifelong effects. Jeffery urges this Court to look at the full picture of his life, to see his deeply regretted choices in context, and to impose the sentence requested.

## V. THE NATURE OF THE OFFENSE

Jeffery Pastor's count of conviction stems from the government's years-long undercover operation to root out corruption in the political sphere in the city of Cincinnati. This investigation led to the arrest of three Cincinnati Council members—Tamaya Dennard, P.G. Sittenfeld, and Jeffery Pastor—each of whom accepted bribe payments from undercover agents in exchange for official action as an elected public official.

When it comes to public corruption, any bribe amount is illegal, whether it takes the form of a single cash payment, multiple cash payments, or political contributions, and Mr. Pastor does not minimize his conduct. As the PSR indicates, Mr. Pastor received a total of $55,000 over five occasions, and he is consumed with shame that he did. That said, it is important to note that the amount and the manner of bribes in each case against each individual former City Council member were—in large part—orchestrated by the government. For example, in Tamaya Dennard's case, *the government* chose to limit the offense conduct to one $15,000 cash bribe even though Ms. Dennard solicited additional bribes on at least ten different occasions. No money exchanged hands on those ten additional occasions because "the FBI refused to pay any more cash in [that] case…" See United States v. Dennard, 1:20CR42, Government Sentencing Memorandum, Doc. # 56, PAGEID # 317. Here, however, the government now uses *its own conduct* as a way to distinguish Ms. Dennard's case from Mr. Pastor's, arguing that the fact that her conduct involved "a single $15,000 payment" militates in favor of a higher sentence for Mr. Pastor. Doc. # 68, PAGEID # 278. But, of course, the fact that the FBI chose to exchange cash on more than one occasion in Mr.

Pastor's case and refused to do so in Ms. Dennard's case does not make Mr. Pastor more morally culpable than Ms. Dennard.

Similarly, in an effort to distinguish Mr. Sittenfeld's case from Mr. Pastor's, the government now asserts that Mr. Sittenfeld accepting a $20,000 bribe payment for a political action committee he controlled is less egregious than Mr. Pastor accepting cash for personal use. Doc. # 68, PAGEID # 278. Such a position brazenly ignores Messrs. Sittenfeld and Pastor's disparate socioeconomic histories and realities. Surely, for a career politician who has never had to worry if his family's fundamental financial needs will be met, a contribution to a political action committee must be at least as valuable and desirable as, for a political newbie whose family's finances are on the brink of collapse, money that can be used to keep the family fed and safely together. Indeed, the government's position actually suggests that if you only accept the money because you want to build up your election campaign coffers that's bad, but not nearly as bad as if you accept the money because you need to provide stable housing for your family. Such a position must be rejected.

In determining a sentence, the Court must consider the nature of the offense, and that analysis necessarily requires looking at Mr. Pastor's offense within the context of the whole investigation. The government made choices along the way that led to and inspired varying offense conduct among the three Council members. But, at bottom, irrespective of differences in the particulars, the culpability of the three Council members is the same. The only difference in the nature and circumstances of their crimes that matters for purposes of sentencing is whether each of them genuinely took responsibility for their crimes. In contrast to Mr. Sittenfeld, Mr. Pastor has clearly accepted responsibility for his actions and acknowledges the wrongfulness and seriousness of his choices. And he is deeply remorseful, both for committing the crime for which he is charged

and for the unintended result of that crime—the potential loss of public trust in City Hall and the resultant aftershocks.

Given the nature and circumstances of his offense, Mr. Pastor's requested sentence comports with the congressional dictate that his sentence be sufficient, but not greater than necessary.

### VI. THE COURT MUST AVOID UNWARRANTED SENTENCING DISPARITY

18 U.S.C. § 3553(a)(6) requires sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Gall, 552 U.S. at 53. In order to do so, "district courts must take account of sentencing practices in other courts." Kimbrough v. United States, 552 U.S. 85, 108 (2007).

To this end, the national data collected by the United States Sentencing Commission shows that the median sentence for all defendants sentenced in the years 2018-2022 under the guideline governing the conduct at issue here (i.e., §2C1.1) was 12 months.[2] Notably, in 2022, 53.8% percent of defendants convicted of bribery and corruption offenses received a variant sentence, in which 98% of those individuals received a downward variance with an average sentence reduction of 60.2%.[3] This data supports Mr. Pastor's requested sentence. Even if the Court were to apply the

---

[2] That same data shows that 90.4% of similarly situated defendants pled, while 9.6% were convicted at trial. Both sets of data can be found here: https://ida.ussc.gov/analytics/saw.dll?Dashboard. The filtering criteria used were the following: Fiscal Year: 2018,2019,2020,2021,2022; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2C1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All.

[3] United States Sentencing Commission, 2022 Quick Facts, Bribery Offenses, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery_FY22.pdf.

average 60.2% reduction using the guideline range of 30-37 months[4] as contained in the PSR (in contravention to the binding range contained in the plea agreement), a 60.2% reduction results in a sentence of 12 months, further underscoring the reasonableness of Mr. Pastor's request for a sentence of 12 months and 1 day.

In addition, the following in-District data is highly relevant:

| Defendant | Accepted Responsibility | Guideline Range | Outcome |
|---|---|---|---|
| Tamaya Dennard 1:20CR42 | Yes | 24-30 months (per agreement) | 18 months (6 months off the bottom end of agreed-upon guideline range) |
| P.G. Sittenfeld 1:20CR142 | No | 33-41 months | 16 months (approximately 50% off the bottom end of the range) |
| Jeffery Pastor 1:20CR136 | Yes | 18-24 months (per agreement) | A sentence of 12 months and a day would be consistent with Dennard's outcome (6 months off the bottom end of agreed-upon range) |

Simply put, 18 U.S.C. § 3553(a)(6) is the safeguard that Congress created to ensure that defendants receive fair, reasonable, and consistently applied sentences. In short, this safeguard ensures equal justice under the law in sentencing, which is foundational to a fair justice system. This statutory directive is critical here, where three Cincinnati Council members committed the same crime during the same term. Mr. Pastor's requested 12 months and a day sentence responds to the congressional dictates encompassed by 3553(a)(6), whereas the government's request of 24 months inescapably does not as Mr. Pastor and Mr. Pastor alone among the three Council members would not experience any variance, let alone the sizable variances Mr. Sittenfeld and Ms. Dennard

---

[4] Notably, the government's sentencing memorandum contains an erroneous reference to an outdated guideline calculation in the PSR. See Doc. # 68, PAGEID # 270 (referencing a range of 37-46 months in ¶118). In fact, as correctly noted in ¶143 of the PSR, pursuant to the amended 4C1.1 guideline, the correct guideline range is 30 to 37 months, based on offense level of 19.

received. There is no legitimate justification for such disparity, and that must be considered by this Court.

### VII. GENERAL DETERRENCE—A MESSAGE TO THE PUBLIC

In determining a sufficient but not excessive length of imprisonment to punish Mr. Pastor for his criminal activity, the Court must consider the sentencing goal of general deterrence. The government often centers its arguments regarding general deterrence on the "message" that must be sent to the general public. For example, the government often opposes a sentence of probation for first-time offenders convicted of nonviolent crimes by arguing that a "message" must be sent to the general public, implying that the wrong message is sent by sentences that do not include imprisonment. Mr. Pastor does not disagree that sentences send messages to the public. The question is what message does this Court want to send.

In determining the length of imprisonment, the Court cannot ignore that P.G. Sittenfeld received a sentence that was half of the bottom end of his guideline range when he has still not accepted responsibility for his crime, even after a jury of his peers let him know that the choices he made were in fact criminal. What message would it send to the public if Mr. Pastor receives the same sentence as that unrepentant individual?

The message this Court would send with a sentence of imprisonment of 12 months and a day for Jeff Pastor is that the Court fully understands its obligations under the law and is committed to engaging in a thoughtful analysis of all of the 3553(a) factors, and that the Court understood the nature of the offense, Mr. Pastor's unique history and characteristics, and the fundamental unfairness that would result if the Court were not to apply a variance similar to those received by the other Council members. Most importantly, the message would ring loud and clear that the Court does not subscribe to a view of justice that preferences those born into privilege over those,

like Mr. Pastor, who have to overcome adversity at every turn. Any sentence greater than 12 months and 1 day, by its nature, sends a very different message, one that simply cannot comport with the congressional goals of sentencing or equal justice under the law.

VIII. **CONCLUSION**

In sum, Mr. Pastor respectfully requests that the Court impose a sentence of twelve months and one day of imprisonment. Such a sentence is reasonable, just, and punishing, and it is consistent with sentences imposed in honest services fraud cases in this district and elsewhere. Mr. Pastor's requested sentence, unlike what the government seeks, is sufficient, but not greater than necessary, to effectuate the purposes of sentencing set by Congress.

Respectfully submitted,

*s/ Karen Savir*
Karen Savir (KY92002)
Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system on this 14th day of December 2023.

*s/ Karen Savir*
Karen Savir